UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAMIEN SHONTELL HEWLETT,

Plaintiff,

v. Case No. 25-C-375

BRIAN BEILKE et al.,

Defendants.

---

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Damien Shontell Hewlett is currently serving a sentence in the Wisconsin prison system. In March 2022, he filed his first §1983 lawsuit. Since then, he has filed fourteen more. Three were dismissed at screening, five were dismissed at summary judgment, and two settled. Hewlett currently has five open cases, one of which is set for trial next month. On May 2, 2025, Hewlett filed a letter in which he acknowledged his then-lawyer's concern that, "based on how many lawsuits [he has] filed," he may be viewed as a prisoner who "only files lawsuits as a hustle." *Hewlett v. Thomsen*, Case No. 24-C-377 (E.D. Wis.) at Dkt. No. 77. Hewlett rejected that characterization, explaining that he has become passionate about the law and noting that he has "the intentions to wrap up all the cases that [he has] compiled right now, so [he] can then focus [his] attention on obtaining [his] paralegal degree through the correspondence course . . . ." *Id.* Nothwithstanding his stated intention, Hewlett has since filed three more cases.

On May 27, 2025, the Court screened the complaint in this case, which similar to complaints in other cases, includes allegations that correctional officers and staff violated the Eighth Amendment when they ignored the risk of serious harm that he imminently posed to himself

and/or failed to adequately address his self-inflicted injuries. On April 16, 2026, after almost eleven months, Defendant Matthew Barth filed a motion for summary judgment, and about a month later, Defendants Brian Beilke, Dane Esser, Darren Glover, Jacob Gripentrog, and Alex Winchel (the State Defendants) filed their own motion for summary judgment. During the months that followed, Hewlett requested numerous extensions of time to respond to Defendants' motions and filed several frivolous motions for sanctions.

In granting Hewlett's motions for more time to respond, the Court advised Hewlett "that his arguments are often difficult to understand because of all the unnecessary detail and bluster that he includes." Dkt. No. 78 at 2. The Court also explained that it "will be better able to evaluate and address his concerns if he concisely presents only the relevant facts." *Id.* Hewlett was also reminded that "[t]he strain [he] feels from having to juggle multiple cases at once is not an extraordinary circumstance warranting the lengthy delay that he requests. Unlike Defendants who did not choose to be sued, Hewlett is the master of his cases and decided to pursue multiple cases at once." Dkt. No. 81. The Court observed that Hewlett "is an experienced litigant and is familiar with the workload necessary to litigate a case," concluding that "Hewlett's poor planning does not justify delaying resolution of Defendants' motions." *Id.* Finally, the Court reminded Hewlett "that summary judgment rises or falls on whether or not there is a dispute of fact" and that "Hewlett knows the facts concerning his case." Dkt. No. 85. The Court noted that it is "familiar with the law and does not require Hewlett to explain the legal basis of his claim so much as to indicate which facts asserted by Defendants are in dispute." *Id.* The Court cautioned Hewlett "to keep his rhetoric to a minimum and instead focus on alerting the Court to the material facts that he believes are in dispute and identifying the evidence that supports his disagreement." *Id.* On September 17,

2026, the Court warned Hewlett (again) that if he did not file his response materials by the deadline, the Court would decide the motion without his input.

On September 24, 2026—the deadline to respond—Hewlett filed yet another motion for an extension of time. He explained (again) that he was out of lined paper and that prison officials would not give him the paper that his mother had kindly purchased for him. At the same time, without any sense of apparent contradiction, Hewlett also asked the Court for permission to file an oversized brief. Hewlett asserted that, although his response materials were already 439 pages long (including exhibits), he was "not yet entirely finished in drafting [his] filings." Dkt. No. 86. He asked the Court to extend his deadline to respond by fifteen days from whenever he got more paper. Hewlett must have reconsidered the wisdom of requesting another extension that the Court had already informed him it would not grant because the Court received 298 pages of Hewlett's response materials, along with a renewed motion for appointment of counsel, just a few days later, on September 28, 2026. Dkt. Nos. 87-94.

For reasons that will soon become apparent, the Court will put aside the issue of whether Hewlett's response materials were timely filed. Unsurprisingly, Hewlett's version of what transpired between him and Defendants differs in material ways from Defendants' versions. If the record were only a swearing contest between the parties, the Court would be required to deny Defendants' summary judgment motions and allow the case to proceed to trial. But the record contains evidence far more reliable than any individual's recollection of years-old events—the record contains *hours* of camera footage showing exactly what transpired that day. And, as the Seventh Circuit has made clear, "[v]ideo evidence . . . can eviscerate a factual dispute . . . when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). Such is the case here, which

is why, for the reasons explained more thoroughly below, the Court will grant Defendants' motions and dismiss this case.[1]

## BACKGROUND

At the relevant time, Hewlett was an inmate at Waupun Correctional Institution, where the State Defendants worked as correctional officers and Barth worked as a nurse. At about 2:00 p.m., on November 25, 2024, Barth was called to Hewlett's cell because he was found face down and non-responsive. When Barth arrived, staff were escorting Hewlett to a restraint chair. Hewlett was able to walk from his cell to the chair and was talking in full and complete sentences. He was brought to the exam room, where Barth took his vitals. Hewlett informed Barth that he was not drinking water because he believed it was contaminated. Barth encouraged Hewlett to increase his water intake and then listened to his heart, lungs, and stomach, all of which were clear, with normal sounds. Barth told officers that Hewlett could return to his cell. Dkt. No. 88 at ¶¶6-20.

Almost immediately after being returned to his cell, at about 2:10 p.m., Defendant Winchel and another non-Defendant correctional officer walked past Hewlett's cell while they were collecting lunch trays. Hewlett was yelling through his cell door that he wanted to see a captain. The non-Defendant officer informed Hewlett that he could talk to a captain, and Winchel informed Hewlett that they would quickly finish their round. About twenty minutes later, Winchel returned to Hewlett's cell. At that time, another officer was speaking to Hewlett and demanding to see his

[1] The Court notes that it and Defendants' counsel expended substantial time and resources on this case, which extensive video recordings conclusively demonstrate is meritless. In future cases, as similar evidence becomes more common due to the use of general surveillance and body cameras worn by correctional staff, counsel is encouraged to avail itself of the Court's "Streamlined Summary Judgment Procedure." *See Instructions for Litigants*, *available at* www.wied.uscourts.gov/judges/william-c-griesbach. This procedure allows a party to avoid the expenditure of time and resources on extensive discovery and motion practice where conclusive video evidence exists that demonstrates the plaintiff has no meritorious claim and the case should be dismissed. Under this streamlined procedure, the moving party need not submit proposed findings of fact, as the Court will determine from the affidavits submitted by the parties and the attached video recordings whether summary judgment is appropriate. Use of this streamlined procedure will not preclude a later motion from being filed under Fed. R. Civ. P. 56, except that any ruling by the Court on such a motion becomes the law of the case.

hand. The officer informed Hewlett that Winchel was the range officer and let Winchel take over. Winchel stood patiently at Hewlett's cell-front for *thirteen* minutes, allowing Hewlett to talk without interruption. Hewlett informed Winchel that he had found a razor in his cell and cut his left forearm. He also told Winchel that he had flushed the razor down the toilet. Hewlett showed Winchel his arm. Winchel thanked Hewlett for letting him know what was going on and asked him to give him some time to address a couple of things, after which he would focus on his issues. Hewlett was not actively harming himself at that time, he was coherent and his thoughts were organized, and there is no evidence that he told Winchel he planned to continue harming himself. Winchel asserts that he did not believe there was an *imminent* risk of Hewlett harming himself. Hewlett was calm, his thoughts were organized, and he represented that he had disposed of the razor. Dkt. No. 89 at ¶¶3-8; Dkt. No. 56-7 (video of Amirah Johnson's body-worn camera, available for viewing in the clerk's office).[2]

About two hours later, at 4:18 p.m., Winchel and a non-Defendant officer walked past Hewlett's cell, at which time Hewlett informed them that he had swallowed a tube of toothpaste. Winchel immediately informed a supervisor and left to inform Nurse Barth while the non-Defendant officer stayed at Hewlett's cell-front, nonchalantly chatting with him—Hewlett stood at his door and did most of the talking while the officer patiently listened to him. Winchel returned about five minutes later to let Hewlett know that Nurse Barth was addressing the situation. Winchel and the officer stayed at Hewlett's cell-front, and Winchel spoke with Hewlett while they waited for more officers. At about 4:30 p.m., Gripentrog arrived, and Hewlett was removed from his cell. He moved and talked without issue, taking time to aggressively yell profanities at officers

[2] Defendants produced a total of eleven body camera and hallway surveillance videos (*see* Dkt. Nos. 41, 56), some of which show the same footage from different viewpoints. The cited proposed statements of fact (and responses thereto) include specific timestamps.

while he demanded to see a captain. Gripentrog calmly interacted with Hewlett, asking him why he was acting like that and assuring him he was trying to help him. Hewlett stated he did not want to be evaluated by the nurse. He was then escorted to a holding cell. Barth did not physically evaluate Hewlett after he was transported to the holding cell. Dkt. No. 89 at ¶¶9, 13-16, 30; Dkt. No. 56-7 (video of Amirah Johnson's body-worn camera, available for viewing in the clerk's office).

Barth asserts that he contacted the on-call provider to inform him that Hewlett had swallowed a tube of toothpaste and to ask how to proceed. Barth states that the provider told him there was no need to call poison control (as Hewlett was repeatedly and loudly demanding) and that he could just monitor Hewlett's condition for changes. It is not clear when, but sometime before 6:00 p.m., Hewlett banged his head against the holding cell door. The skin in the middle of his forehead broke open, and a thin line of blood began to slowly trickle down. Dkt. No. 88 at ¶¶26-27; Dkt. No. 56-3 (video of Beilke's body-worn camera, available for viewing in the clerk's office).

At about that time, Beilke arrived at the holding cell to speak with Hewlett, who was aggressively yelling at Winchel. With visible relief at Beilke's arrival, Winchel began to leave, and Hewlett began to yell at both Beilke and Winchel. Beilke began to walk away, and when Hewlett protested, Beilke instructed Hewlett to talk to him like an adult. Hewlett composed himself and began to talk in a controlled manner. Hewlett insisted that poison control should have been called. Beilke assured him that health services had been notified that he had swallowed toothpaste. Hewlett continued to argue and talk over Beilke, repeatedly accusing officers of neglect. Beilke eventually walked away after informing Hewlett he was not listening. Around that time, a psychological services staff member ordered that Hewlett be placed in observation

status. Hewlett was then strip-searched, dressed in a suicide smock, and brought to the examination room. By then, the blood on Hewlett's forehead had dried. Hewlett walked to the exam room on his own and sat on the table without issue. Dkt. No. 56-3 (video of Beilke's body-worn camera, available for viewing in the clerk's office).

Barth began to take Hewlett's vitals, but Hewlett demanded that photographs be taken of his injuries first to document the harm he had inflicted on himself. Barth paused his evaluation and left the exam room. Beilke entered the exam room, at which time Hewlett began to lecture Beilke and two other officers about proper policy and procedure and reminded Beilke that he sues officers all the time, even bragging that he got a pay award of "13Gs." Exasperated, Beilke agreed to take pictures of Hewlett's forehead and left arm injuries, neither of which was actively bleeding. He even agreed to Hewlett's demand that he be allowed to view the pictures. Despite Hewlett's relentless antics, Beilke never raised his voice or lost his composure. Barth then briefly entered the exam room to complete his examination. Barth asserts that the wound on Hewlett's forehead measured less than a quarter of an inch, and the wound on his arm was about an inch long with no active bleeding. Barth asserts that Hewlett was exhibiting normal neurological behavior and that the cut on his arm would heal on its own without stitches. Dkt. No. 88 at ¶¶35-44; Dkt. No. 56-3 (video of Beilke's body-worn camera, available for viewing in the clerk's office).

As Hewlett was exiting the exam room, he told Beilke that his arm laceration needed stitches because it could get infected. Beilke stated he was not a nurse. His demands not being met, Hewlett laid on the floor, saying "this is abuse" and informing officers that if they wanted to neglect him, they would have a problem. Beilke asked for a restraint chair so they could transport Hewlett to an observation cell. Despite the absurdity of the situation, officers remained impressively calm, repeatedly trying to convince Hewlett to act reasonably and walk to the

observation cell. Nearly *ten* officers patiently stood around Hewlett while he sat in the restraint chair talking non-stop, refusing to let go of the chair strap, and challenging officers to use force against him. Gripentrog, who had arrived in response to the disruption, calmly explained to Hewlett multiple times that they did not want to use force against him. Hewlett repeatedly challenged Gripentrog to tase him and refused *many* orders to let go of the strap so he could be safely secured in the chair. After Hewlett's repeated refusals and taunts, Gripentrog reluctantly used his taser to administer a short dry stun to Hewlett's thigh. Hewlett immediately asked what time it was, thanked Gripentrog, and demanded that he take pictures of the taser burn and have a nurse evaluate the injury. Gripentrog took pictures of Hewlett's leg and arm as he demanded. Hewlett continued to argue during the transport to the observation cell. Gripentrog remained impressively calm and patient throughout. Dkt. No. 89 at ¶¶9, 13-16, 30; Dkt. No. 56-4 (video of Gripentrog's body-worn camera, available for viewing in the clerk's office).

Once at the observation cell, Hewlett continued to lecture officers about his rights and make demands. He then began to ask about the blood on his hands, expressing concern about where it was coming from. Gripentrog informed him it was coming from the small cut on his forehead, gave him clear directives about entering his cell, and informed him that they could have the nurse check on him. Once Hewlett was in his cell, he placed his hands out of the trap so Gripentrog could remove the tether. But then Hewlett abruptly and aggressively snatched his hands back into his cell and refused to comply with orders to allow Gripentrog to remove the tether. Hewlett angrily demanded that he be evaluated by a nurse other than Barth. Gripentrog calmly explained that Barth was the nurse on duty and asked Hewlett to put his hand out so he could take the tether. Hewlett then started yelling about officers not calling poison control. Gripentrog assured Hewlett he would be okay and ordered him to let him take the tether. Hewlett

continued to act out, yelling that he was not feeling right, touching the cut on his forehead and smearing blood on the window, and then hitting his head a few times on the window, asking Gripentrog if he was going to stop him. Gripentrog continued to assure Hewlett he was going to be fine and reminded him that health services had checked on him and that while he was in observation, he would be checked on every fifteen minutes. With incredible patience, Gripentrog continued to talk with Hewlett and ask him to let him take the tether. It took more than *fifteen* minutes to convince Hewlett to comply with orders to place his hands outside his cell so staff could remove the tether. Dkt. No. 56-4 (video of Gripentrog's body-worn camera, available for viewing in the clerk's office).

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at

trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

The Eighth Amendment prohibits the intentional infliction of cruel and unusual punishment on persons convicted of a crime by officers or agents of the State. *See Wilson v. Seiter*, 501 U.S. 294 (1991). The Eighth Amendment has also been construed to prohibit the deliberate indifference by prison officials to serious injury or harm to prisoners that flows from other causes. The Supreme Court's first application of this principle was in the medical context. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (internal citation omitted)). Over time, the principle was extended to other risks of harm that inmates face in prison. For example, in *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), the Supreme Court held that prison officials' deliberate indifference to a substantial risk of serious harm posed by other inmates can constitute cruel and unusual punishment. In both *Estelle* and *Farmer*, it was the fact that the prisoner, by virtue of his incarceration, was deprived of the ability to protect himself from injury or harm that gave rise to liability on the part of prison officials when they were aware of the risk of harm and failed to act.

More recently, this principle has been extended by lower courts from the risk of harm that prisoners face from external threats to the harm that prisoners cause *themselves*. The extension of the principle to self-harm makes sense when the prison inmate suffers from a severe mental illness that deprives him of his rational faculties. An inmate who is unable to control his own conduct due to a severe mental illness is no more responsible for the harm he inflicts on himself than an inmate who is at risk of serious harm because of injury, disease, or another inmate. It thus follows

that correctional officers who deliberately ignore the risk of injury a seriously mentally ill inmate presents to himself can be held liable for subjecting the inmate to cruel and unusual punishment.[3]

It is at least questionable, however, whether the same rule should apply to inmates who do not have severe mental illnesses such that they are deprived of their rational faculties. *See Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 889 (E.D. Wis. 2006). It seems more than strange that if such a prisoner were to assault or kill another inmate or guard while serving his sentence, he could be charged with battery by a prisoner or first-degree intentional homicide. *See* Wis. Stat. §§940.20(1), 940.01. Yet, if the *same* prisoner were to harm or kill himself, he or his estate could bring a §1983 action against the guards who failed to stop him. This is because, under the law of this circuit, as it relates to incidents of self-harm and suicide, incarcerated persons are "deemed incompetent." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (citing *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006)).

The dramatic increase in self-harm cases in the courts suggests that imposing liability on prison officials for failing to prevent sane inmates from harming themselves may not keep prisoners safe from themselves but may instead incentivize them to harm themselves in an effort to engineer Eighth Amendment violations (something the Seventh Circuit has explicitly cautioned against). As a result, recalcitrant prisoners are able to manipulate prison staff, drain the resources of the prisons and taxpayers, and divert attention from other deserving prisoners. *See Bowers v.*

---

[3] While personality disorders and certain mental health conditions such as depression and anxiety are common among the prison population, it would seem that severe mental illnesses that deprive an inmate of his rational faculties should be somewhat rare in the State's prisons. If a person charged with a crime is not responsible for his crime because of a severe mental illness, he is sent to a mental health facility or institution, not a prison. Wis. Stat. §971.17. So too, a person whose mental illness renders him incompetent to stand trial for a crime is not sentenced to prison. Instead, such a person is either released or committed to a mental health facility. Wis. Stat. §971.14. Inmates who become severely mentally ill while serving a sentence for a crime can also be transferred to a mental health facility if they are in need of treatment the prison cannot provide. Wis. Stat. §51.20(1)(ar); *but see* Jason L. Stern, *Prison (In)Justice: An Examination of the Deliberate Indifference Standard in 42 U.S.C. §1983 Jail-Suicide Claims*, 10 SETON HALL CIR. REV. 173, 175 (2013) ("Today, mental illness is endemic in prisons across the country.").

*Pollard*, 602 F. Supp. 2d 977 (E.D. Wis.), *aff'd*, 345 F. App'x 191 (7th Cir. 2009); *Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121, at *8 (E.D. Wis.), *aff'd*, 761 F. App'x 598 (7th Cir. 2018); *see also* John R. Fitzgerald, *Sane, Manipulative Self-Harm: When Hostage and Hostage Taker Become One*, 123 W. VA. L. REV. 583 (2020).

In *Freeman*, the Seventh Circuit instructed that prison officials must prevent prisoners who have "given way to the [psychological] strain" of incarceration from seriously injuring or killing themselves. 441 F.3d at 547. *Freeman* was careful, however, to distinguish between allowing suffering as punishment and allowing suffering as a self-inflicted consequence of bad behavior. The former is prohibited by the Constitution; the latter is a valuable teaching tool. The most obvious example of the latter is a mother who refuses to give her child candy even after he goes red in the face and gets dizzy from holding his breath. To require prison officials to intervene to prevent *all* threats of self-harm empowers prisoners to undermine prison discipline and disrupt an otherwise orderly environment simply by threatening to inflict uncomfortable, though non-life-threatening, injuries upon themselves. *Id.* at 546-47.

*Freeman* stresses that, *at some point*, prison officials have a duty to step in and prevent a prisoner from endangering his own life or health. But when there is no indication that a prisoner's life or health is seriously jeopardized, then prison officials do not violate the Constitution when they permit a prisoner to endure the suffering, discomfort, and temporary detrimental consequences that he rationally chooses to inflict upon himself. *Id.* at 547 (affirming summary judgment in favor of prison officials because the prisoner's food deprivation was "self-inflicted" and there was no evidence that he experienced "real suffering, extreme discomfort, or any lasting detrimental health consequences").

Here, the video evidence clearly demonstrates that Hewlett's life and health were never seriously in jeopardy. Hewlett endured a small laceration on his left arm and an even smaller abrasion on his forehead, both of which stopped bleeding without medical intervention. He also claims he had a stomachache from swallowing toothpaste, temporary dizziness and headaches, and some light sensitivity from hitting his head against his cell doors. None of these injuries were serious, and *all* of them were self-inflicted. *See id.* (holding that self-inflicted symptoms such as blurred vision, dizziness, and significant weight loss, while unpleasant, did not expose the plaintiff to "real suffering, extreme discomfort, or any lasting detrimental health consequences"); *see also Lord v. Beahm*, 952 F.3d 902, 904-05 (7th Cir. 2020) ("This case is different, as it reflects an inmate's insincere suicide threat to get attention. Lord was upset that Officer Stoffel would not return to his cell, and he reacted by screaming that he had a blade and was taking his life, only then to inflict minor scratches.").

It is clear from the video recordings that although Hewlett claimed he was suicidal, he was not serious about trying to take his own life. He demanded that his self-inflicted injuries be documented and repeatedly accused the officers of failing to follow policy. These are steps one takes as a precursor to a federal lawsuit, not to end his life. Because Hewlett never posed a serious risk to his own health, the point at which Defendants would have been required to step in never arrived. Instead, like the mother who patiently stands by while her child holds his breath and stomps his foot, officers were entitled to allow Hewlett to endure the suffering, discomfort, and temporary detrimental consequences that he rationally chose to inflict upon himself. Of course, as the video recordings show, officers did far more than just stand by.

The State Defendants are not only entitled to summary judgment, they deserve to be commended for the restraint and self-control they exhibited in the face of Hewlett's abusive

behavior. Across the board, all Defendants listened to Hewlett's demands, endured his abuse, gently pushed back on his bad thinking, and offered him the chance to act reasonably. Hewlett chose a different path than the one repeatedly offered to him, trying to provoke the officers into using excessive force and deciding that a little self-inflicted suffering was nothing compared to the payout that might exist on the other side. And, because the suffering he inflicted upon himself was not objectively serious, Nurse Barth is also entitled to summary judgment. Hewlett's injuries—which consisted of minor abrasions, a stomachache, headaches, and dizziness—resolved without medical intervention, so Hewlett suffered no harm from Barth's decision not to provide bandages or call poison control. *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) ("In order to succeed in a §1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." (citations omitted)).

As his former lawyer observed, Hewlett appears to have discovered a profitable hustle. In the short term, his threats and minor self-inflicted injuries are rewarded with attention by officers who are required by prison policy and procedures (no doubt developed in response to the liability threat) to stand at his cell-front and listen to him vent his frustrations and lecture them on how they should do their jobs. If their patience and attention fails to satisfy him, then, no matter, because he has successfully laid the groundwork for a federal lawsuit that provides him with an additional opportunity to grandstand, lecture, and pontificate. And, as Hewlett himself boasted, in some cases, he may even be rewarded with thousands of dollars. Unfortunately for the rest of the inmates and the prison administration, Hewlett's behavior managed to occupy for several hours the attention of more than a half-dozen officers who presumably would have been performing other necessary tasks instead of responding to his antics. Watching and listening to the video and audio

recordings gives one an appreciation of the difficulty correctional officers and staff face in responding to inmates threatening to harm themselves.

It is not clear how to best address the very real issue of suicide and serious self-harm in prisons. As this case and others suggest, deeming all inmates "incompetent" by virtue of their incarceration alone, *Miranda*, 900 F.3d at 349, and thereby giving them a potentially lucrative federal claim against prison staff who fail to prevent them from harming themselves may not be the best answer. As the author of the above cited article concludes, "[p]risoner self-harm presents a unique and challenging problem." Fitzgerald, *supra*, 123 W. VA. L. REV. at 610. While no one is suggesting that the courts return to the "hands-off" approach that courts took to prison administration in the past, it is worth recalling the reasons for that approach:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974) (footnotes omitted), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). The problems of prison administration have become only more difficult since the abolition of indeterminate sentencing and parole

systems which, when properly utilized, incentivized inmates to obey prison regulations in the hope of earlier release. *See* Fitzgerald, *supra*, 123 W. VA. L. REV. at 608-09. In any event, in this case, the correct outcome is clear. Defendants are entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motions (Dkt. Nos. 37, 51) are **GRANTED** and this case is **DISMISSED**. The clerk's office is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Hewlett's motion to file an oversized brief (Dkt. No. 86) is **GRANTED**, his motion for an extension of time (Dkt. No. 86) is **DENIED**, and his renewed motion to appoint counsel (Dkt. No. 94) is **DENIED as moot**.

Dated at Green Bay, Wisconsin this 15th day of October, 2026.

William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. § 1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.